Argued November 19, affirmed December 31, 1959

JACKSON *v.* NICOLAI-NEPPACH CO.

348 P. 2d 9

*Robert S. Miller,* Portland, argued the cause for appellant. On the brief were King, Miller, Anderson, Nash & Yerke and Paul R. Meyer, Portland.

*Earl F. Bernard,* Portland, argued the cause for the respondent. On the brief were Bernard, Bernard & Edwards and William E. Hurley, Portland.

Before McAllister, Chief Justice, and Rossman, Sloan and King, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff, owner of 50 per cent of the corporate stock of the defendant, Nicolai-Neppach Co., an Oregon corporation, from a decree of the circuit court which denied the plaintiff's prayer for the appointment of a receiver to liquidate the business of the corporation and distribute its assets to its shareholders. The principal ground of the complaint is that the shareholders are deadlocked in voting power and for three successive years have been unable to elect successors to the members of the board of directors. The suit was brought under a section of the Oregon Business Corporation law, ORS 57.595 (1)(a)(C) which authorizes liquidation in the event of shareholder deadlock.

The section of our laws just cited provides:

"(1) The circuit courts shall have full power to liquidate the assets and business of a corporation:

"(a) In an action by a shareholder when it is established:

"(A) That the directors are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock, and that irreparable injury to the corporation is being suffered or is threatened by reason thereof; or

"(B) That the acts of the directors or those in control of the corporation are illegal, oppressive or fraudulent; or

"(C) That the shareholders are deadlocked in voting power, and have failed, for a period which includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have expired or would have expired upon the election of their successors; or

"(D) That the corporate assets are being misapplied or wasted."

The circuit court, after hearing the evidence, dismissed the suit and from that order this appeal was taken.

The Nicolai-Neppach Co. is located in Portland. It is a close or family corporation. The business is the manufacture of lumber products such as sash, doors, cabinets and store fixtures. The business was begun in 1866 and the company was incorporated in 1887. Herbert Jackson, brother-in-law of the plaintiff, joined the company as an employee in 1928. At that time the principal shareholder was the president and general manager of the company, C. E. Cowdin. In 1931 Herbert Jackson married Eva Jackson, who was employed by the company as a stenographer and secretary to Mr. Cowdin. After her marriage she ceased her employment.

In 1945 Herbert Jackson was offered opportunity to purchase the stock of Nicolai-Neppach Co. Upon that development he consulted his brother, Arthur Jackson, who was familiar with the lumber industry,

and the two of them together with Mr. Cowdin incorporated in August 1945 the Jackson Company. Five hundred shares of stock of no par value were authorized and 51 of the shares were issued, 25 to each of the Jacksons and one to Cowdin. No further shares have been issued. The directors then elected Herbert Jackson president, Cowdin vice president and Arthur Jackson secretary treasurer.

September 1, 1945, the Jackson Company entered into an agreement to purchase the stock of Nicolai-Neppach Co. for $180,000 payable over a term of twelve years. In October 1945 the Jackson Company changed its corporate name to Nicolai-Neppach Co.

The three years following 1945 were boom years in the construction industry and the Nicolai-Neppach Co. earned large profits, enabling it by 1949 to complete payments under the stock purchase agreement. At that time C. E. Cowdin surrendered his share of stock and withdrew from the company. Mr. Robert R. Rankin, attorney for the company, thereupon accepted this share of stock in trust for the Jacksons in order to comply with a provision of the by-laws that all members of the board of directors must be shareholders and was then elected to membership upon the board. The other two directors were Herbert and Arthur Jackson. Herbert Jackson retained the presidency. Mr. Rankin became vice president and Arthur Jackson continued as secretary and treasurer.

Herbert and Arthur Jackson jointly managed the business of the company. From 1945 onward each received a salary of $11,000 which was increased by a resolution of the board of directors in December 1949 to $13,750. Harmony apparently prevailed.

April 7, 1950, Arthur Jackson died and the plaintiff, his wife, inherited his shares of stock. In the light

of that fact Rankin delivered his one share of stock, one-half to Herbert Jackson and one-half to Hazel Jackson who is now the plaintiff in this suit. Thereupon Mr. Rankin resigned from the company. At that juncture there were two vacancies in the membership of the board of directors which were filled May 18, 1950, by the election of Hazel Jackson and Eva Jackson. Herbert Jackson had assigned one share of his stock to his wife, Eva, in order to qualify her as a director. The shareholdings, which since have remained static are as follows:

| | |
|---|---|
| Herbert Jackson | 24½ shares |
| Eva Jackson | 1 share |
| Hazel Jackson | 25½ shares |

Since the death of Arthur Jackson, Herbert Jackson has been the sole active manager of the corporation and the only shareholder-officer to draw a salary. Hazel Jackson, the plaintiff, served as vice president and treasurer from 1950 to 1952 and Eva Jackson during those years as secretary. At the directors meeting of December 6, 1952, Hazel Jackson yielded the office of treasurer to Eva Jackson in order to facilitate record keeping, and since that time has held only the office of vice president. In 1951 the company loaned to Hazel $8,000 to help her finance Myrtle Creek Building Supply, Inc., a company which is operated by her brother.

Dissension between Hazel and Herbert Jackson receives its first mention in the minutes of the stockholders meeting that was held December 6, 1952. The by-laws that were adopted by the Jackson Company in 1945 called for the corporation to be governed by a board of three directors, all of whom were required to be shareholders. In the 1952 meeting Mrs. Hazel Jack-

son (the plaintiff) assisted by her attorney, Carl Davidson, demanded that the by-laws be amended to add a fourth director, and explained that thereby her 50 per cent interest would have equal representation with that of Herbert Jackson. Robert Rankin, for the company, objected on the grounds that it was customary to have an odd number of directors, that Hazel Jackson had had no experience in company management and that it was for her benefit as well as that of the others to leave the affairs of the company in Herbert Jackson's control. The plaintiff then moved that the three Jacksons be re-elected "with the understanding that her action was not to prejudice her request for equal representation on the Board of Directors." The plaintiff stated "that there was no complaint against the management or service of the president, Herbert W. Jackson, but that the request of representation was based solely on her desire for equal representation on the Board." At the directors meeting which immediately followed the plaintiff suggested, through her attorney, that a dividend of $12,000 for the year was justified, but Mr. Jackson stated that large sums would shortly have to be spent upon repairs to the plant. Action upon the plaintiff's question was thereupon postponed until Jackson collected data upon which a sound decision could be made.

In the course of the meeting of the shareholders November 16, 1953, the plaintiff was represented by Ralph H. King and Robert S. Miller as her counsel. An amendment of the by-laws to require four directors was again proposed by her. When a vote was taken the proposal was defeated by an equal division. According to the minute book the three Jacksons then elected themselves directors for the ensuing year. However, the complaint filed by the plaintiff alleges

that no election of directors occurred in 1953; its words are:

> "At the postponed annual meeting of defendant held November 16, 1953, no successors to the then directors were elected by affirmative vote of the shareholders."

The defendant's answer admits that averment. Notwithstanding that state of the pleadings, the minutes of the meeting of the stockholders that was held November 16, 1953, show the election of all three Jacksons; their words are:

> "The election of directors was then called and stockholder Eva B. Jackson nominated Herbert W. Jackson and Hazel M. Jackson for directors and Herbert W. Jackson nominated Eva B. Jackson for director.
>
> "There being no other nominations or other stockholders from whom nominations could be had and the law requiring three directors of this corporation, the three were unanimously declared elected as directors of Nicolai-Neppach Co., an Oregon corporation."

At the meeting of the directors which followed Mr. King, on behalf of the plaintiff, proposed a dividend of $11,985. Mr. Jackson, however, stated that he "felt some dividend should be declared, but not that much, and that he would like consideration given to an advance in salary for the reasons that had been previously cited and discussed." Mr. King replied that "they had a motion before the Board for dividends and that they were not going to bargain on that motion in connection with the request for increase in salary of Herbert W. Jackson." A vote for the dividend was lost by an equally divided number. Two additional votes for reduced dividends were lost by equally divided votes, until finally agreement was reached on a divi-

dend of $150 per share or $7,650. Mr. Jackson then moved that his salary be increased from $13,750 a year to $20,000. Although a by-law provides that "The salaries of all officers shall be fixed by the stockholders," this motion was lost by a one to one vote of the directors. Mr. Jackson had abstained from voting on account of his personal interest. A motion to increase his salary to $15,000 was also defeated. Mr. Jackson declined to ask for a smaller increase.

At the shareholders meeting in 1954 Mr. Jackson again refused to allow a change in the by-laws for a board of directors of four members. The plaintiff then proposed Mr. King, Mr. Miller and Orval O. Hager, all three of the law firm of King, Miller, Anderson, Nash and Yerke, as directors. Mr. Jackson proposed as directors the three Jacksons. The vote failed to yield a majority for either of the proposed slates and thereupon under the by-laws the old board of the three Jacksons continued in office. At the directors meeting which followed, the plaintiff proposed a dividend of $235 a share or $11,985, but this was defeated along with five other motions for reduced sums until all agreed on a dividend of $75 a share or a total of $3,825. In the meantime Mr. Jackson had emphasized that as much as $10,000 would be needed for modernizing the plant by replacing steam power with electricity. He invited the directors to go through the plant with him for inspection, but "This they refused on the grounds of lack of qualification to pass upon the project."

Apparently, 1954 was not a particularly successful year for the company. The net earnings were $8,235.69. Some of the company's competitors were liquidating. The directors authorized Mr. Jackson to borrow up to $20,000 for use in the business, but he found it unneces-

sary to borrow anything. Mr. King and Mr. Miller suggested liquidation. Mr. Jackson objected, "maintaining that there could and would be better years but as it was, the company was not liquidating as many of its competitors were and that the old uses of wood, lost through competition with steel, were now coming back, as some of the new orders being received, would show." Mr. King, on behalf of the plaintiff, then proposed a resolution directing the president of the company to "investigate and assemble facts regarding dissolution of the corporation and report what he learned at a special meeting of the directors to be held December 6." This was defeated, as was a similar proposal that the corporation employ outsiders to survey the possibilities of liquidation.

April 27, 1955, the plaintiff instituted the suit now under review for involuntary liquidation. At the shareholders meeting November 12, 1955, a motion to increase the number of directors was defeated for the third time. The stockholders were once again deadlocked on the election of a board of directors. At the directors meeting a dividend of $12,750 was declared. A dividend of $17,850 had been requested earlier by the plantiff, but Mr. Jackson again protested that funds were required for modernization. At this meeting the plaintiff, upon her own volition, moved that Mr. Jackson's salary be increased $3,000 for the term of one year.

The year 1956 was prosperous for Nicolai-Neppach Co. An unprecedented dividend of $25,500 was declared and Mr. Jackson's increased salary was continued for another year. However, the deadlock continued. The plaintiff again cast her votes for Messrs. King, Miller and Hager as directors and Mr. Jackson cast his for the three Jacksons. The minute book of

the corporation introduced in evidence ends with this year.

Mr. Jackson testified that the firm employed about 65 men among whom were "many that have been there longer than I have." He expressed the belief that "the future is very good" and that "things really look pretty good." He expressed a hope of obtaining orders from the State Board of Higher Education and from various construction projects about Portland.

The recent history of the Nicolai-Neppach Co. is thus one of continuing prosperity marred, however, by the dissensions of the two 50 per cent shareholders. Owing to that deadlock and the fortuity which saw two directors of Mr. Jackson's faction in power at the time the deadlock began, he is in control and the plaintiff, as a director, is without power equal to his. There is no evidence that Mr. Jackson has abused his dominating position to the injury of the plaintiff or that he has managed the company other than for the good of all the shareholders as he understands their good. In her complaint the plaintiff alleged that the acts of Herbert and Eva Jackson have been arbitrary and oppressive. She averred abuse of discretion in several aspects such as failure to pay larger dividends, to increase the board of directors, to vote for liquidation. At the trial, however, plaintiff moved to strike all allegations of oppression and mismanagement. Her counsel stated, "We are not undertaking to charge the management with oppression or mismanagement or any illegal acts."

The plaintiff's position at the trial was that ORS 57.595 (1)(a)(C) is mandatory and that a corporation must be liquidated when it is shown that there is a deadlock in voting power and a failure to elect directors for two consecutive years. Consistently with that

position plaintiff's counsel stated that no evidence of dissension would be offered and that the plaintiff's only evidence would be directed at a showing of deadlock over dividends, liquidation and election of directors. To that end the plaintiff introduced in evidence minutes of the corporation and rested. Objection was then made to all efforts of the defendant to interpose equitable considerations. Plaintiff's counsel made clear her position that:

> "In our view of the case there is only one issue here: It is deadlock; that there were no successors elected to the directors in the years '53, '54, '55 and '56. So we would like to interpose an objection at this time to all evidence going to any aspect of the case other than whether or not a deadlock in fact exists, because we feel that any such evidence as was outlined in the opening statement of counsel is immaterial and irrelevant."

Although the position taken by the plaintiff upon this appeal is not entirely clear, she argues that liquidation must be without regard to benefit or detriment to the shareholders.

ORS 57.595 was taken haec verba from Section 90 of the American Law Institute's Model Business Corporation Act. The present section 90 first appears in the 1953 revision of the model act. In turn, section 90 of the model act was taken haec verba from a section of the Illinois Business Corporations Act, 32 Smith-Hurd Illinois Ann Stat, ch 32, § 157.86, amended by Laws, 1951, p 1299, § 1, so that the Illinois shareholder deadlock provisions and those of Oregon are identical. The Model Business Corporation Act is largely based on Illinois experience, the Illinois Business Corporations Act of 1933 serving as the "parent act." See Whitney Campbell, "The Model Business Corporation Act," 11 Business Lawyer No. 4, p 98, 100 (1956);

Ray Garrett, "Model Business Corporation Act," 4 Baylor Law Review 412 (1952); American Law Institute, Model Business Corporation Act (1953 revision) p 84.

At common law petitions for dissolution presented by 50 per cent shareholders were often dismissed with the statement that a court of equity lacked "power" or "jurisdiction" to dissolve a solvent corporation in the absence of statutory authority. *Reid Drug Co. v. Salyer,* 268 Ky 522, 105 SW2d 625 (1937); *Bowman v. Gum, Inc.,* 321 Pa 516, 184 A 258 (1936); see *Cook v. Cook,* 270 Mass 534, 170 NE 455 (1930); *Hammond v. Hammond,* 216 SW2d 630 (Tex Civ App 1948). The only exception was when the dissension between groups of stockholders was so serious as to lead to waste, corporate paralysis or oppression of one group by another. Under those circumstances some states held that a court of equity could appoint a receiver and wind up the affairs of the company. See annotation, "Dissolution of corporation on ground of intracorporate deadlock or dissension," 13 ALR2d 1260, 1263 et seq. Illinois does not appear to have had a case calling for the application or rejection of that exception.

When Illinois enacted its shareholder deadlock statute in 1951, it had before it not only such cases as those cited above, but the decisions of its own appellate courts in *Lush'us Brand Distributors, Inc. v. Fort Dearborn Lithograph Co.,* 330 Ill App 216, 70 NE2d 737 (1946) and *Gidwitz v. Cohn,* 238 Ill App 227 (1925). In the Gidwitz case one of two equal shareholders in a solvent corporation demanded the appointment of a receiver to liquidate the company on the ground that the stockholders could not agree to fill a vacancy in the board of directors. It was provided by statute

that failure to fill a vacancy did not effect a dissolution. The court cited the following language of *People v. Weigley,* 155 Ill 491, 40 NE 300, as controlling:

"* * * It is well settled by the decisions of this court as well as the authorities generally, that courts of chancery are without jurisdiction to decree the dissolution of corporations, except in so far as that jurisdiction is conferred by statute * * *."

Since the statutes at the time did not provide for liquidation in the event of deadlock, the suit was dismissed. *Lush'us Brand Distributors v. Fort Dearborn Lithograph Co.* was an action by a corporation, of which Novak had practical control and in which he owned 50 per cent of the stock, against Adler, a 50 per cent stockholder in the same corporation, to prevent Adler from using a company trademark, and for an accounting. Adler counterclaimed for dissolution of the company. The court found against Adler on the original claim and dismissed the counterclaim on the authority of *Gidwitz v. Cohn.*

It was in the light of this background that Illinois enacted the shareholder deadlock provisions of its corporation act, granting the courts of equity "full power" to liquidate a corporation whose shareholders are deadlocked in voting power and fail for two successive years to elect successors to directors. This "full power" is described in the title of the section—a title adopted by the Model Business Act and Oregon Business Corporation Law—as a matter of "jurisdiction." The actual title is "Jurisdiction of court of equity to liquidate assets and business of corporation."

Although the Oregon courts have not been called upon to decide whether there is a common law right to wind up a corporation at the suit of a 50 per cent

stockholder, it is likely that they would have followed the general rule is denying relief. *Wills v. Nehalem Coal Co.,* 52 Or 70, 96 P 528 (1908), was an action precipitated by a fraudulent sale of stock to the wife of a promoter and director of the corporation. The petition asked for the appointment of a receiver to liquidate the corporation and that the wife be required to pay full value for her shares or surrender them. The trial court sustained demurrers to the complaint and this court reversed, holding that a good cause of action was stated and that the relief of payment for shares or cancellation was proper. As for liquidation of the company, it said:

> "* * * No facts are alleged, however, upon which an equity court may appoint a receiver for the assets of the corporation and wind up its affairs.

> "In the absence of statutes enlarging powers, the general rule is, that a court possessed of chancery powers merely, has no jurisdiction at the suit of a stockholder, to dissolve a corporation and decree its winding up, for the misuser or nonuser of its franchise, or for other cause."

Moreover, prior to 1927, under our law receivership was an ancillary remedy only and could not be sought as primary relief. Oregon Laws § 1108. In *Cook v. Leona Mills Lumber Co.,* 106 Or 520, 212 P 785 (1923), the owner of 51 per cent of the defendant company's stock sought a receiver to preserve the assets of the company. This relief was granted by the circuit court, but this court reversed, stating:

> "Under our Code the appointment of receivers is an ancillary remedy, in aid of the primary object of litigation, and such relief must be germane to the principal suit, and a proceeding cannot be maintained where the appointment of a receiver is the sole primary object. Neither at law nor in equity

is an action permissible in which only the appointment of a receiver is sought."

In 1927, by Oregon Laws 1927, ch 107, p 102, the legislature added what are now subsections (7) and (8) of ORS 31.020, providing that courts may appoint a receiver:

"(7) In cases provided by statute, when a corporation or cooperative association has been dissolved, or is insolvent, or in imminent danger of insolvency, or has forfeited its corporate rights.

"(8) When a corporation or cooperative association has been dissolved or is insolvent or in imminent danger of insolvency and it is necessary to protect the property of the corporation or cooperative association, or to conserve or protect the interests of the stockholders or creditors."

By way of obiter this court said, in *Rugger v. Mt. Hood Electric Co.,* 143 Or 193, 20 P2d 412, 21 P2d 1100 (1933):

"The appointment of a receiver to liquidate and wind up the affairs of a corporation is a harsh remedy and ought not to be invoked except in extreme cases and then only as a last resort."

■ The shareholder deadlock provisions of the Illinois Business Corporation Act, of the Model Business Corporation Act, and of the Oregon Business Corporation Law are clearly couched in language of permission. It is incredible that the many able lawyers who worked from time to time on these three identical acts would have used such phraseology to express a mandate. The statute contemplates that the court of equity shall take jurisdiction once a requisite showing of fact is made and contemplates further that having taken jurisdiction it will bring its discretion to bear in granting or refusing to grant equitable relief. The very fact that the legislature has made the remedy of liquida-

tion a matter of discretion for the courts is a mandate to us to use discretion, and we would not be carrying out the legislative will by simply decreeing liquidation as a matter of course once the jurisdictional facts and nothing more are proven. The common law rule was thought to be an insufficient safeguard of the rights of the half-owner of a corporation who happened to be out of power. The drafters of the shareholder deadlock provision apparently thought that any statutory rule which provided for liquidation as a matter of law would insufficiently safeguard the rights of the half-owner who happened to be in power. As we read the statute its intent is to obligate the courts to thread their way from case to case without the assistance of sweeping generalizations.

In arguing for liquidation of the Nicolai-Neppach Company, appellant places her principal reliance on *Strong v. Fromm Laboratories,* 273 Wis 159, 77 NW2d 389 (1956), which construed the shareholder deadlock provision of the Wisconsin business corporation law, Wis Ann Stat 180.771 (1)(a)(4). Wisconsin had adopted the Model Business Corporation Act and the shareholder deadlock provision is in every material respect identical to our own, ORS 57.595 (1)(a)(C). In the Strong case the Supreme Court of Wisconsin decreed liquidation of a prospering corporation, and it is appellant's argument that the decision ought to be followed here. We think, however, that the facts of the Strong case and the reasoning of the Wisconsin court set the case apart from the one that is before us.

*Strong v. Fromm Laboratories* was an action by Harland Strong, trustee of 50 per cent of the share of Fromm Laboratories, Inc., for liquidation of the company. Fromm Laboratories was a Wisconsin corporation created in 1933 by Edward and Walter

Fromm and Dr. Robert Gladding Green. Strong represented the Green interests. The Fromm interests owned the other 50 per cent stock interest. The company manufactured vaccines used in the fur farming business and at the time of the petition for dissolution was prosperous. However, the corporation had never paid a dividend. Dr. Green drew a salary as active director of the laboratories and the Fromms were salaried officers. The by-laws of the corporation provided that only stockholders were to be directors. Moreover, as stated in the opinion:

> "The by-laws * * * contain no provision permitting the members of the board of directors to fill a vacancy on the board. Instead, such by-laws expressly provide that, in the case a vacancy should occur on the board of directors, the board shall call a special meeting of the stockholders for the purpose of filling such vacancy, and that *until such vacancy is filled the board 'shall transact no other business than to authorize the calling of the special meeting' for the purpose of filling the vacancy.*"

Dr. Green died in 1947. By will he left his stock in trust to Strong for the benefit of his niece Gale Green. The trust was to last until Strong should sell the stock. The Fromms were granted first purchase rights. Green had also entered into an inter vivos written agreement with the Fromms, granting them a first option to purchase his stock, which was to be binding on his estate. The Fromms apparently made no move to purchase the Green interest. Strong had a disagreement with the Fromms which became acute in 1951.

The by-laws of the corporation called for a board of four directors. Although Wisconsin law requires an annual election of directors (Wis Ann Stat 180.32 (2)), no meeting of stockholders was held, after a

single meeting to elect Dr. Green's successor in 1947, until the year 1953. The 1953 stockholders meeting was "abortive." A vote on only one director was taken which resulted in a tie. In 1954 another shareholders meeting was called. Strong cast his share for himself as director and "against any other candidate for director"—doing this because all of the other eligible shareholders were members of the Fromm party and Strong, as trustee, could not assign any of his shares to an ally. The Fromms cast their votes for three other shareholders and declared Strong's negative ballot a nullity, but the Supreme Court held that it was valid, and deadlocked the election.

On the above facts the trial court denied dissolution but the Supreme Court reversed with orders to liquidate the company. To an argument that there was no showing of benefit to the stockholders the court replied as follows:

> "Because of the extensive research made by the committee of eminent Wisconsin corporation lawyers who sponsored the 1953 addition of par. 4 of section 180.771 (1)(a) to our new corporation code, we must assume that its members were familiar with the New York and Minnesota deadlock statutes and court decisions interpreting the same, and that they preferred to work the Wisconsin statute so as not to make dissolution or liquidation, because of a stockholders' deadlock, contingent upon a finding that the same will be beneficial to stockholders. We, therefore, hold that whether or not a liquidation of Fromm Laboratories, Inc., will be beneficial or detrimental to the stockholders is not a material factor to be considered in exercising the power of liquidation conferred by par. 4 of section 180.771 (1)(a) Stats."

The further argument was made that the power of dissolution was discretionary by statute, "and that

there was no abuse of discretion on the part of the trial court in refusing to exercise such power." The opinion of the Supreme Court makes it clear that reversal was based on abuse of discretion rather than absence of discretion, and furthermore, that the primary reason for which dissolution was granted was lack of a legally functioning board of directors—a situation not present in Nicolai-Neppach Company. We quote from the relevant paragraphs of the opinion:

"Section 180.30, Stats., provides that, 'The business and affairs of a corporation shall be managed by a board of directors.' The by-laws of Fromm Laboratories, Inc., expressly prohibit the board of directors of such corporation from transacting any business after a vacancy occurs on the board, except to call a meeting of the stockholders to elect a successor director, until such vacancy has been filled. This by-law was undoubtedly adopted for the purpose of insuring that neither the Green nor Fromm interest should be able to manage the corporate business, in the event of the death of a director, as a result of having two members to the other's one among the other three members of the board. We thus have a situation where, ever since Dr. Green's death on September 6, 1947, the board of directors has been without legal power to manage the business of the corporation. The fact that the two directors representing the Fromm faction have usurped such power and may have capably exercised the same is wholly beside the point.

\* \* \*

"In the instant case there is no *alternative corrective remedy*, other than that provided by section 180.771 (1)(a) 4, Stats., which will permit Fromm Laboratories, Inc., to function and be legally managed as required by section 180.30, Stats., and the corporate by-laws. It, therefore, was an abuse of discretion for the trial court not to have decreed a liquidation."

The by-laws of Nicolai-Neppach Co. provide that the board of directors shall consist of three members "who shall hold office until the next annual meeting and until their successors are elected and have qualified." At a time long before any dispute arose, the incorporators, Herbert and Arthur Jackson and C. E. Cowdin, construed this provision to mean that the directors were "to hold office until the next annual meeting of stockholders, *or* until their successors were duly elected and qualified." This appears from the "Incorporators' Certificate of Election" of August 31, 1945, which appears in the company minute book. Moreover, ORS 57.185 provides that:

> "* * * Each director shall hold office for the term for which he is elected and until his successor shall have been elected and qualified, unless removed in accordance with the provisions of the by-laws."

ORS 57.141 provides that:

> "* * * The bylaws may contain any provisions for the regulation and management of the affairs of the corporation not inconsistent with law or the articles of incorporation."

Therefore, whether by act of the legislature or by virtue of the by-laws of the company—which, it is unnecessary to decide—the board of directors of Nicolai-Neppach Co. in office at the time of the deadlock continued to function legally thereafter. *Strong v. Fromm Laboratories* held, on the other hand, that under Wisconsin law the by-laws of a company may be drawn so as to paralyze effectively the corporate function. In addition, the by-laws of Nicolai-Neppach Co., by requiring three directors, indicate that the stockholders of that concern placed a higher value on effective corporate action than on equal representation

of their equal interests while the by-laws of Fromm Laboratories, by requiring four directors, indicate that the stockholders insisted on equal representation even at the risk of deadlock.

Appellant argues that we can not consider benefit to the stockholders as a factor in decreeing or withholding liquidation since the shareholder deadlock provision of our statute fails to require it, citing the language of *Strong v. Fromm Laboratories* which we have quoted above. She notes that Virginia, which has adopted section 90 of the model act, changed the shareholder deadlock provision to require "That as shown by the proceedings at any meeting of the stockholders the stockholders are deadlocked in voting power and that irreparable injury to the corporation is being suffered or is threatened by reason thereof  *  *  *."

Benefit to the shareholders is a condition precedent to the granting of dissolution on the grounds of shareholder deadlock in some jurisdictions, notably New York. The New York Gen Corp Law, ch 23, § 103, provides:

"Unless otherwise provided in the certificate of incorporation, if a corporation has an even number of directors who are equally divided respecting the management of its affairs, or if the votes of its stockholders are so divided that they cannot elect a board of directors, the holders of one-half of the stock entitled to vote at an election of directors may present a verified petition for dissolution of the corporation as prescribed in this article."

Section 117 provides that the court must make a final order dissolving the corporation if upon application it appears that a dissolution "will be beneficial to the stockholders or members and not injurious to the public  *  *  *." *In re Radom & Neidorff,* 307 NY 1, 119 NE2d 563 (1954), denied dissolution of a corporation

on facts outlined by Justice Fuld in a dissenting opinion:

> "* * * Neidorff died in 1950, at which time respondent, through inheritance, acquired her present 50% stock interest in this business. Since then, all has been discord and conflict. The parties, brother and sister, are at complete loggerheads; they have been unable to elect a board of directors; dividends have neither been declared no distributed, although the corporation has earned profits; debts of the corporation have gone unpaid, although the corporation is solvent; petitioner, who since Neidorff's death has been the sole manager of the business, has not received a penny of his salary—amounting to $25,000 a year—because respondent has refused to sign any corporate check to his order. More, petitioners business judgment and integrity, never before questioned, have been directly attacked in the stockholder's derivative suit, instituted by respondent, charging that he has falsified the corporation's records, converted its assets and otherwise enriched himself at its expense. * * *"

The appellate division dismissed the petition and this was affirmed in the court of appeals by a four to three vote. The majority said that "The primary inquiry is always, as to necessity for dissolution, that is, whether judicially-imposed 'death will be beneficial to the stockholders or members and not injurious to the public.' "

█ If the Wisconsin court, in ruling that benefit to the stockholders is not a material factor to be considered in proceedings for dissolution, had in mind the "benefit" that exists by virtue of mere solvency, which apparently was that contemplated by the New York Court of Appeals in *In re Radom & Neidorff,* we tend to agree with its position. If, on the other hand, it means to suggest that we can not consider actual benefits to the stockholders in the form of such

matters as payment of regular and substantial dividends, then we can not accept its viewpoint. We must remember that *Strong v. Fromm Laboratories* was a case in which the complainant was receiving no dividends from the company while the faction in power were drawing substantial salaries. We think that actual benefit to the stockholders is a factor which may properly be considered in determing whether dissolution is to be granted. We say this not because we think the petitioner in such cases has a duty to be satisfied in spite of himself, but because we must consider the rights of the 50 per cent interest which is in control of the company as well as that which is out of control.

Appellant argues that because the director deadlock provision of our act, ORS 57.595 (1)(a)(A), requires a showing of "irreparable injury to the corporation" before the court can liquidate a company by reason of a deadlocked directorate which the shareholders can not break, and because such a requirement is absent from the shareholder deadlock provision, a further reason is thus provided why we can not consider benefit or detriment to the stockholders. We do not understand the statute in this way. We can not equate "irreparable injury" and "benefit to the shareholders." The former is a much more restrictive idea. The absence of a requirement of "irreparable injury" from the jurisdictional facts which must be proven in a petition for dissolution by reason of shareholder deadlock certainly does not indicate that we must dismiss from our consideration of the equities of the case any showing of actual benefit to the stockholders from the operation of the company. We think that it is only persuasive of the fact that "irreparable injury" is not properly a decisive factor. We take note of the fact

that the shareholder deadlock provision did not appear in the 1950 revision of the model act. It was added to the 1953 revision after Illinois had included such a provision in its Business Corporation Act. To this extent, therefore, Section 90 is not made up of integrated subsections, and reasoning from one subsection to another must therefore be done with caution.

Appellant also cites two recent New Jersey cases as supporting her view that the corporation ought to be dissolved. The corporation act of New Jersey, RS 14:13-15, NJSA, provides that corporations "may be dissolved" in the event of shareholder deadlock. Petition of Collins-Doan Co., 3 NJ 382, 70 A2d 159 (1949), presented a situation in which the stock of the company was divided into preferred and common, each of which was to be represented by two directors. Doan took the preferred and Collins the common. The company was a prosperous printing house. The factions became deadlocked over non-payment of dividends on the preferred stock. Collins, without authorization from the directors, ruled the corporation as a personal desmesne for the benefit of himself and his son. They received salaries and moved the business into a building owned by the son at an annual rental of $4,200. It is clear from the opinion that dissolution was granted because of corporate paralysis.

> "* * * Collins concedes that the differences are irreconcilable. Thus, dissension has rendered the directorate impotent; and the like equal division of interest and voting power among the stockholders put it beyond their power to cure this paralysis of function by the election of a directorate of an uneven number.
>
> *       *       *
>
> "There is no alternative course. For ten years or more the Company has not functioned as ordained by the law; and irreconcilable differences

between the equally divided shareholders and directors render a resumption of function impossible. * * * RS 14:7-1 N.J.S.A. provides that the 'business of every corporation shall be managed by its board of directors, not less than three in number.' And the statute has in view also the protection of the interests of the shareholders. There is no corporate function here. The business is under the management of one who happened to be serving in that capacity when the deadlock occurred; and the direction has become personalized to the exclusion of all other interests. * * *"

*In re Evening Journal,* 15 NJ Super 58, 83 A2d 38 (1951), granted a petition for dissolution of a solvent daily newspaper. Dissension among the shareholders, however, lost it business that it might have enjoyed. The Dear and Newhouse factions were at odds. The directors, four in number and evenly divided between the two factions, were holding over since no nominees at subsequent elections received a majority. There was interference with payment of salaries. By virtue of his position as president and editor Dear had arrogated to himself the entire control of the company. There was evidence that both parties could protect themsleves at a public or private sale of the newspaper. Again the court relied on paralysis of corporate function as a basis for dissolution. It said:

"Defendants have not proved bad faith on the part of the plaintiffs. They charge that they are attempting to ruin the company but not the newspaper. But where is the proof? There is resistance by plaintiffs to Dear's attempt to be sole manager of the association, but is not that something which they may properly do? If the stock holders are impotent to elect a board of directors by reason of the equal division of the stock into two independent ownerships or interests, if the directors are equally divided respecting the management of the corporation and the president of the association

and editor of the newspaper assumes to act as the sole manager, what is more natural for the ownership of one-half of the stock of the association to do than seek the remedy of dissolution? Plaintiffs have a very substantial investment in the association and they have the right to protect it.

\* \* \*

"\* \* \* Due to the equal division on the board of directors that body has been unable to control and manage the operation of the business. In the absence of action by the directors, Dear has assumed the general management of the corporation. To an extent Newhouse has tolerated this. He has resisted in some respects. But is he required to suffer control and management by the Dear half-interests indefinitely? \* \* \*"

Reviewing *Petition of Collins-Doan Co.,* supra, the court concluded:

"Hence the test is not whether routine business is carried on or not, or whether business is being conducted at a profit or a loss, but whether there is a paralysis of corporate function."

Appellant also cites and relies upon the reasoning of a scholarly article by Carlos L. Israels, "The Sacred Cow of Corporate Existence—Problems of Deadlock and Dissolution," 19 U of Chic L Rev 778 (1952). It is Mr. Israels' position that courts should be reluctant to "put themselves in business" by reviewing the equities of cases involving deadlock among shareholders, and that the model act is susceptible of a mechanical and "pragmatic" interpretation. Mr. Israels apparently would permit dissolution whenever the jurisdictional facts are proven. If we assume, arguendo, that a mechanical rule is desirable, if only from the standpoint of facility of administration, we have nevertheless already expressed our view that the statute contemplates that courts shall consider the equities of the individual case. If this were not true, the shareholder

deadlock provision would have been expressed in terms of mandate rather than permission.

██ Viewed in this light we do not think that appellant has made out a case for liquidation of the Nicolai-Neppach Co. While her sole purpose in introducing the minute book of the corporation into evidence was to show deadlock and failure of the stockholders to elect a board of directors, the minute book as well as other evidence furnishes us with a broader view of the activities of the company. Even so, there is nothing in evidence which persuades us to enter an order winding up the company. We think that the plaintiff has not only the burden of proof to establish jurisdictional facts under the shareholder deadlock provision, but the further burden of proving equitable grounds for dissolution. She has failed to meet that burden.

The evidence before us is that Herbert Jackson has refused to allow the board of directors to be increased to four members—which would certainly result in further deadlock—and that he has refused to consider liquidation of the company. We do not think that it is lack of equity for a stockholder who is in control of a deadlocked company to refuse to vote against his own interests, even though the effect is to perpetuate him in office. The evidence shows affirmatively that Herbert Jackson has ably administered the company for the benefit of all of the stockholders, and that he has agreed to the distribution of profits in dividends in so far as they were not required for the repair or development of the plant. These profits have been substantial. The plant employs about 65 men and there is a public interest in preserving it as a going concern.

The evidence shows, moreover, that Hazel Jackson has an effective weapon of corporate management

through her control over Herbert Jackson's salary. The power to fix officers' salaries is vested in the stockholders by virtue of the by-laws. There is thus no danger, so long as the company remains prosperous, that the incumbent management will be able to siphon off profits of the corporation through salaries rather than dividends.

We need not decide at what point we would hold that dissolution must be granted as a matter of right. Traditionally a court of equity will not interfere with the exercise of business discretion by the directors and officers of a company. Perhaps this is a branch of the law where we will find it necessary to do so under proper circumstances. But such circumstances are not present in this case. The proper solution of the impasse reached in Nicolai-Neppach Co. appears to be for one of the two shareholders to purchase the other's shares. We think an equitable adjustment will be reached by denying rather than granting dissolution in this case. To decree liquidation would give Hazel Jackson a club to hold over the head of Herbert Jackson. To deny liquidation imposes upon each party a certain amount of burden and uncertainty so long as their differences continue. There is a possibility that Hazel and Herbert Jackson may compose their differences amicably—it does not appear so far that either has attempted to oppress or unfairly deal with the other. If they can not settle their disagreement, then we think that denial of relief at the present time may well lead to a fairer buy-sell agreement than the remedy of enforced liquidation, a remedy which might destroy the going concern value of the plant and give both parties an unduly small return for the value of their investment.

The judgment of dismissal is affirmed.